IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

2/9/2018

JULIA C. DUDLEY, CLERK
BY: S/J.Vasquez

DEPUTY CLERK

| | |
|---|---|
| KEYSTONE TRANSPORTATION SOLUTIONS, LLC | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) Case No. 5:18-cv-00039 |
| NORTHWEST HARDWOODS, INC. Serve: Corporation Service Company Registered Agent Bank of America Center 1111 East Main Street Richmond, Virginia 23219 | ) ) ) ) ) ) ) ) ) |
| THOMAS MEREEN Serve: Thomas Mereen 202 Barclay Street Bedford, Pennsylvania 15522 | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT

COMES NOW the Plaintiff, KEYSTONE TRANSPORTATION SOLUTIONS, LLC,

by counsel, and moves for judgment against Defendants, NORTHWEST HARDWOODS,

INC. ("NW Hardwoods") and THOMAS MEREEN ("Mereen"), on the grounds as

hereinafter set forth.

## INTRODUCTION

This matter involves the conspiracy to harm a company, Keystone Transportation

Solutions, LLC ("Keystone"), which had established a market niche based on its logistics

technology designed for forestry and agricultural products.  As a result of that

conspiracy, Keystone lost a unique opportunity to sell its business and secure long-term employment for the principals.  By breaching various agreements and fiduciary relationships (and by misappropriating trade secrets entrusted them by Keystone), the defendants have both harmed Keystone and illegally enriched themselves.

## PARTIES AND JURISDICTION

1.     Plaintiff Keystone is a now defunct Front Royal, Virginia based shipping and logistics company, which was duly organized under the laws of Delaware.

2.     Defendant NW Hardwoods is a national lumber company incorporated in the state of Delaware with its principal place of business in the state of Washington.  It is one of the largest providers of forestry products in the world.

3.     Defendant Mereen is a resident of the Commonwealth of Pennsylvania and was formerly the President of Keystone. Mereen is currently employed by NW Hardwoods as its Log Export Lead.

4.     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 as this matter presents a federal question, specifically arising under The Defend Trade Secrets Act of 2016 as codified at 18 U.S.C. § 1836, *et seq.*, and the remaining claims are so closely related to the federal question that they form part of the same case or controversy.

5.     Venue and jurisdiction are proper in this Court pursuant to Federal Rules of Civil Procedure 4(k)(1)(A) and Va. Code § 8.01-328.1 as all defendants transact substantial amounts of business within the Commonwealth of Virginia, as more fully described *infra*.

## STATEMENT OF FACTS

### Business Model of Keystone

6.      From its inception in 2014, Keystone was a shipping logistics company with its principal place of business at the Virginia Inland Port (the "Inland Port") in Front Royal, Virginia. It specialized in the shipping logistics of raw logs and timber ("Forest Products") from domestic sources to foreign ports.

7.      Specifically, Keystone's business model was predicated on increasing and capturing efficiencies in the transportation of Forest Products harvested from the Appalachian region of the United States.

8.      Traditionally, timber resources would be harvested in rural areas of West Virginia, western Virginia and Pennsylvania then transported by trucks to regional saw mills. Forest Products designated for foreign export required the requisitioning of empty containers from long-distance deep-water ports, typically Norfolk or Baltimore.  Empty containers would be delivered via truck to the distant inland sawmill operations, loaded and then trucked back to the deep-water port for export.

9.      With respect to transporting raw logs (as opposed to milled lumber), these loaded containers must additionally be delivered to near-port fumigation facilities before being returned to the port facilities for container ship loading.

10.      This process, as described above, was time-consuming, subject to road weight limitations, expensive, and inefficient.  Fully delivered transportation costs and fees for raw logs and lumber would often be 50% or more of the cost-of-good-sold in the Forest Products industry.

11.      To address this situation, Keystone located its facilities at the Inland Port— significantly closer to the saw mills and timber forests. At these facilities, Keystone's

business model provided three efficiencies (and thus greater profits) compared the traditional model:

a. Transportation — By loading the products into containers and then onto rail cars at KTS's operations on the Inland Port in Front Royal, Keystone significantly reduced the miles Forest Products spent on trucks—rail transportation being far cheaper—and avoided costly transfer and transportation services at the deep-water ports;

b. Fumigation — By fumigating the products on-site at the Inland Port, Keystone saved the additional costs of taking them to a "near port" facility prior to shipping; and

c. Load Optimization — By loading the products into intermodal containers at the Inland Port (which could then be loaded directly from the railway onto ships), Keystone made each container more profitable by weight optimizing each container load, which routinely allowed 18-22% more product per container vs. the traditional over-the-road export transportation practices.[1]

12.    All told, as proven by empirical data, the Keystone model provided an 18-25% reduction in shipping costs.

13.    A critical part of Keystone's business was its License Agreement dated August 1, 2015 ("the Lease") with Virginia International Terminals ("VIT")—a statutorily created limited liability corporation which owned and managed the Inland Port—for

---

[1]    Trucking has weight restrictions that are substantially lower than with rail transport. Therefore, traditionally when loaded containers left the regional saw mills (after arrival via truck) they did not have the maximum payload of goods that the container/ship would permit.

industrial space at the Inland Port. This gave Keystone a leasehold to a large industrially-zoned space to undertake its activities as well as direct access to rail transport.

14.     The Lease was for 10 acres of wooded property adjacent to the rail loading area of the Inland Port and Route 522. Upon entering the Lease, Keystone invested $500,000 in its Inland Port leasehold ("the Premises") over the next year to clear the land and build a road (with a bridge) to connect the property to the main roads. The purpose of this investment was to construct the facilities onsite to expand the capacity of Keystone—and the Inland Port, generally—for moving Forest Products. This was done at the sole expense of Keystone with no credits given by VIT.

15.     In addition to the real property improvements, Keystone invested an additional $1.5 million of capital during the Lease period on: equipment for loading/fumigating, training for employees, and additional infrastructure.

<u>Introduction with NW Hardwoods</u>

16.     As a national company in Forest Products, NW Hardwoods was one of the target customers for Keystone and potentially one of the biggest beneficiaries from its cost-saving technology.

17.     In late February 2016, an investor in Keystone ("Investor") met with a director/investor of NW Hardwoods and set up introductions with the upper management of both companies. Copies of these introductory emails are attached hereto as Exhibit 1.

18.     On February 26, 2016, the leadership of Keystone and the leadership of NW Hardwoods[2] participate on an hour-long teleconference concerning mutual business opportunities arising from Keystone's operations at the Inland Port.

19.     From the outset, there were two primary business opportunities[3] between the parties: (1) optimizing NW Hardwoods' profitability for export trading through the use Keystone's facilities at the Inland Port (the "**Logistics Proposal**"); and (2) Keystone purchasing logs from NW Hardwoods for its own export customers likewise using the same facilities and proprietary model (the "**Log Trading Proposal**").

20.     Following the February teleconference, the parties set up a meeting, which occurred on March 24, 2016 at the Holiday Inn Express in Front Royal, Virginia. This meeting was between Steffens and Ellis of Keystone and Hammond and Knavenshue of NW Hardwoods.  It specifically focused on the warehousing, shipping, and handling of NW Hardwoods' exported Forest Products—i.e. the Logistics Proposal.

21.     After the Front Royal meeting, Keystone agreed to provide a proposal for the warehousing and handling of Forest Products, i.e. the Logistics Proposal.[4]

22.     On April 1, 2016, Ellis followed up by email with Knavenshue and Hammond to discuss details of the Logistics Proposal: specifically, the "on port" receiving capabilities at the Inland Port "utilizing a loading service that [Keystone] would dedicate to the effort."   A copy of this email chain is attached hereto as Exhibit 2.

---

[2]     The following people participated on the February 26th conference call:  For Keystone:  David Steffens (CEO) ("Steffens"), Bill Ellis (CFO) ("Ellis"), Mereen (President) and Investor; For NW Hardwoods:  Darrell Keeling (COO) ("Keeling"), Bo Hammond (Head of Log Sales) ("Hammond"), and Mike Knavenshue (Transportation Head) ("Knavenshue").

[3]     While the initial communications between the parties included Keystone purchasing finished lumber from NW Hardwoods, this relationship never materialized.

[4]     Keystone also introduced its President, Mereen, to Hammond, the head of "Log Sales" for NW Hardwoods, to work on the Log Trading Proposal by email on March 25, 2016.  From that point forward, Mereen took the lead on the Log Trading Proposal as discussed *infra*.

23.     This business opportunity with NW Hardwoods would require Keystone's construction of overhead infrastructure and the dedication of two tractor units. Exh. 2 at 2. The outcome of this proposal, if accepted, was that NW Hardwoods would "supplant" Keystone as the largest shipper out of the Inland Port. *Id.*

Keystone Provides for Initial "Test Loads"
For Logistics Proposal

24.     In response to Ellis, Knavenshue stated that he was interested in shipping "test loads" through Keystone's facilities at the Inland Port to determine the shipping capacity and cost savings for the Logistics Proposal using Keystone's business site, logistics model and proposed methods. Exh. 2 at 1.

25.     From April 2, 2016 through May 12, 2016, there were extensive communications between the parties to facilitate the "test load" for NW Hardwoods.

26.     On May 12, 2016, the first "test load" was sent via two trucks from NW Hardwoods facility in Dailey, West Virginia and was loaded into a single container[5] at Keystone's facilities at the Inland Port.

27.     On May 17, 2016, Knavenshue reached out to Ellis to inform him that the test was a success and that the Keystone model had produced sufficient cost savings for NW Hardwoods in order for them to move the collaboration further. Knavenshue also requested information regarding the pricing of trucking from various NW Hardwood facilities to Keystone's location at the Inland Port.

28.     Following up, Ellis (on behalf of Keystone) set up a teleconference with Steffens and Noel Adcock ("Adcock"), the Global Shipping Coordinator of NW

---

[5]     As discussed *supra*, Keystone utilized "intermodal" shipping containers which can be carried by train or placed on a cargo ship without needing to unload the cargo. These are the traditional 40' containers that are standardized internationally.

Hardwoods, to discuss the finances of the opportunity, including Keystone's transportation model and its contract rates with third parties. Ellis followed this phone call with an email on May 20, 2016, a copy of which is attached as Exhibit 3.  Knavenshue answered on May 20, 2016 that he was going to work up cost estimates from NW Hardwoods' other mill locations and would then respond. *See* Exh. 3.

29.     On May 31, 2016, Knavenshue requested, by email, a meeting at Keystone's facilities at the Inland Port to review the cost estimates.

30.     The "cost estimate review" meeting occurred on June 8, 2016 at the Premises between (i) Steffens and Ellis of Keystone, and (ii) Knavenshue and Larry Evans, president of NW Hardwoods' subsidiary lumber company. Knavenshue and Evans toured Keystone's facility and discussed the results of the pilot test and advantages that NW Hardwoods could achieve by using the Keystone model.

31.     At this meeting, Keystone presented a proposal to NW Hardwoods laying out in summary fashion the savings from using its logistics and transportation solutions. A copy of the slides from this PowerPoint proposal are attached hereto as Exhibit 4.  At this point, neither side was committed to the project.

<u>Mereen Negotiates "Log Purchasing Proposal"</u>

32.     From the March 24, 2016 meeting in Front Royal and moving forward, Mereen, as President of Keystone, had an increasingly close and important relationship with NW Hardwoods regarding both Keystone's Log Purchasing Proposal and its overall negotiations with NW Hardwoods.

33.     Specifically, Mereen was in contact with NW Hardwood's Log Sales division (through its then-chief Hammond). On or about May 3, 2016, Mereen on behalf of Keystone entered into a log purchase agreement with NW Hardwoods and filled out a

credit application for the same. This initiative was intended to provide short-term revenue to Keystone

34.  On behalf of Keystone, Mereen from May 2016 forward would purchase logs directly from NW Hardwoods for supply to Keystone's own customers.

35.  When Hammond left NW Hardwoods in mid-June 2016, Mereen reached out to the COO of NW Hardwoods, Keeling, for a new point of contact for continuing the log exportation relationship. A copy of these emails is attached as Exhibit 5.

36.  Keeling responded that he was interested "in developing a log program with you as well." Exh. 5 at 1. On June 20, 2016, Keeling provided the contact information for the new regional sales manager to Mereen. *Id*.

37.  The following month (July 2016) led to a marked increase in the number of logs purchased by Keystone from NW Hardwoods.

38.  On July 21, 2016, Mereen reached out to Keeling to set up a conference call to discuss expanding the log trading between NW Hardwoods and Keystone. This call took place on the following day.

39.  Subsequently, the orders from Keystone to NW Hardwoods for logs continued to increase. In total, Keystone would purchase approximately $350,000 in logs from NW Hardwoods from March through November.

<u>Parties Discuss Joint Venture re: "Logistics Proposal"</u>

40.     On June 20, 2016, while the trading relationship was growing, Ellis from Keystone reached out separately to Keeling to discuss the parties developing a closer relationship moving forward.  A copy of this email is attached as Exhibit 6.

41.     Specifically, Ellis solicited interest in either the parties entering into a joint venture or NW Hardwoods acquiring an equity stake in Keystone, with the intention of using Keystone's technology to improve the profitability of NW Hardwoods.

42.     On June 21, 2016, NW Hardwoods—through its Vice-President for the Appalachian Region—submitted a formal proposal to Keystone. A copy of this proposal is attached hereto as Exhibit 7.

43.     Under the proposal, Keystone would construct covered warehouse facilities at the Inland Port with the express purpose to receive, store, and load NW Hardwood's lumber into shipping containers. Exh. 7 at ¶¶ 1-9. It further proposed prices and other terms for the parties' relationship moving forward. *Id*. at ¶¶ 16-21. The proposal was for Keystone to act as an independent contractor of NW Hardwoods—however, NW Hardwoods would retain the "first right of refusal" regarding Keystone's capacity to handle Forest Product exports. *Id*. at ¶¶ 10-11.

44.     In response, on July 25, 2016, Steffens (on behalf of Keystone) reached out to Keeling by email with a counter-proposal to establish a joint venture between Keystone and NW Hardwoods. A copy of this email is attached as Exhibit 8.

45.     Keeling replied on July 29, 2016, stating: "sorry for the delay but we do pretty well with our log program today. We absolutely want to grow it **but we need to make sure we are as profitable with a partner as we would be on our own**. **OF [sic] course the last part of that statement will come with the information through the NDA**." Exh. 8 at 1 (emphasis added).

<u>Non-Disclosure Signed, Initial Information Exchanged</u>

46.     At least as of July 2016, both Keystone and NW Hardwoods understood that a non-disclosure agreement ("NDA") would have to be signed prior to any exchange of confidential information—which was necessary to determine if a joint venture for the Logistics Proposal made fiscal sense. *See id*.

47.     Following up on Keeling's email, Ellis provided Keystone's prospectus to NW Hardwoods on August 1, 2016.  The prospectus described in general terms Keystone's unique business model and technology as well as the market opportunity specific to NW Hardwoods.

48.     The parties followed up the proposals with a teleconference on August 11, 2016 between Keeling, Mereen, Ellis and Steffens. During this call, the parties agreed to enter the NDA and to set up a formal meeting to explore a relationship between the parties going forward.

49.     Both parties signed the NDA on August 11, 2016. A copy of this NDA is attached hereto as Exhibit 9.

50.     On August 29, 2016, Ellis confirmed a meeting between NW Hardwoods and Keystone to be held on September 1, 2016. A copy of this email chain is attached hereto as Exhibit 10.

51.      Along with this confirmation email—and pursuant to the NDA between the parties—Ellis sent along a proposed agenda for the meeting outlining a new, joint-venture entity between NW Hardwoods and Keystone ("New Entity Proposal"). A copy of this New Entity Proposal is attached as Exhibit 11.

52.     Keeling confirmed receipt of the New Entity Proposal and responded that it provided "an excellent start" and "sum[med] up the thoughts Tom [Mereen] and I

expressed via phone last week." Exh. 10 at 1. Keeling continued his earlier line of

questioning from July 29 (*see* Exh. 8 at 1) as follows:

> The only thing missing and must be answered is: How does
> the entity make enough money to ensure we are all happy with
> the returns? Since we have not yet been privy to any of your
> financial models nor actual operating results it is difficult to
> understand. . . . **Since we have an NDA if you can share
> any financial data, it would be very helpful**.

Exh. 10 at 1. (emphasis added)

53.     On September 6, 2017, Ellis forwarded to Keeling by email a confidential,

consolidated financial model for the contracts Keystone had executed since April of 2015,

which demonstrated in detail the profitability of its business at the Inland Port.

Parties Begin Formal Negotiations and
Exchange More Proprietary Data

54.     On September 1, 2016, the parties held a comprehensive, five-hour meeting

at the Premises which was attended by TJ Rosengarth ("Rosengarth"), CEO of NW

Hardwoods, Keeling and two other members of the finance department. Hosting the

meeting on behalf of Keystone was Ellis, Steffens, and Mereen and an investor in

Keystone,.

55.     In preparation for this meeting, Steffens prepared a financial model that

incorporated Keystone's proprietary data and methods and matched it with data relating

to NW Hardwoods' exports from their largest mill location to their most common export

port. This financial model showed that NW Hardwoods would enjoy 18% savings per

container at its current export levels utilizing Keystone's model.

56.     At this meeting, Keystone gave a tour of its facilities and made lengthy

presentations about its transportation model—as briefly summarized *supra*—and in

explaining Steffens' financial model. Notably, Keystone's model produced the same

savings regardless of whether NW Hardwoods was utilizing the model for its log export business or for finished lumber.

57.     During the meeting Rosengarth stated that NW Hardwoods was only interested in pursuing a complete purchase of Keystone rather than entering into a joint venture or alternative arrangement.

58.     The night of September 1st, 2016, Rosengarth of NW Hardwoods sent an email to Steffens, Ellis, and Mereen with a list of due diligence requests to "confirm our interest and put together a formal proposal." A copy is attached as Exhibit 12.

59.     The following day (September 2, 2016), Ellis responded to NW Hardwoods confirming that Keystone was likewise interesting in pursuing a deal and stating that they would provide the due diligence items requested in short order. A copy of that email chain is attached as Exhibit 13.

60.     Following up on Ellis' email, Steffens emailed on September 6, 2016 attaching a confidential model for NW Hardwoods to "evaluate the logistics and transportation opportunities that [Keystone] offers." Exh. 13 at 1.

61.     Following a request by NW Hardwoods on September 10, 2016, the two parties held a joint conference call on September 12, 2016 to discuss the Keystone model. At the outset of this call, Keeling stated: "we'd like to cover the economics for shipping logs from the Inland Port. We will go over [Steffen's] model to ensure we are all on the same page and agree with the costs and metrics."

62.     On September 19, 2016, Ellis created a "Google Drive" shared between the officers of Keystone and NW Hardwoods with the previously requested due diligence documents. These due diligence documents contained Keystone's: highly sensitive

financial information, confidential financial models for shipping/fumigation, market research, and organizational documents. *See* Exh. 12 at 1-2.

63.     Over the next eight weeks, i.e. through November 14, 2016, (i) NW Hardwoods conducted numerous site visits to Keystone's business site at the Inland Port and (ii) Keystone continued to supply additional financial information as well as validation for its previously produced information.

64.     On November 14, 2016, Ellis and Steffens had a telephone conversation with Keeling regarding the status of the deal. Keeling reiterated NW Hardwoods' interest in Keystone's logistics model and its desire to retain Keystone's executives after the acquisition. During this call, Ellis informed Keeling that the deal valuation discussions were being handled by the Investor in Keystone.

65.     On November 23, 2016, Keeling and the Investor discussed valuation. Specifically, the Investor raised the fact that the principals and investors of Keystone had contributed $2 million in capital to date and an additional 15,000 hours of "sweat equity." The Investor further discussed the potential cost savings to NW Hardwoods that was evident from the information the parties had exchanged. Namely that NW Hardwoods had an opportunity to save $2.0 million annually in its log trading business using Keystone's methods with additional potential savings, up to $5 million annually, with some equipment investment. NW Hardwoods likewise stood to save up to $5 million annually in its lumber trading with additional capital expenditures.

66.     The terms offered by the Investor were for sale as follows:

    a.   $2 million as an upfront cash payment;

    b.   $2 million paid over time on a "per container" royalty basis.

67.     They closed the call with Keeling stating he would let Keystone know about NW Hardwoods' response on November 28, 2016.

68.     On November 29, 2016, Ellis and Steffens had another telephone conversation with Keeling about the status of the deal. Keeling stated that the acquisition was on the agenda at NW Hardwoods' upcoming Board of Directors meeting. During this call, Keeling stressed the very large volumes that NW Hardwoods would be handling through the facility and its focus on building a lumber warehouse facility at Keystone's current location. Further, Keeling emphasized the high importance that NW Hardwoods placed on the Lease with the Inland Port and the ability of Keystone to transfer the Lease and the relevant permits. Based upon Ellis and Steffen's prior conversations with VIT, as described *infra*, they assured Keeling that VIT was amenable to transferring and/or revising the Lease as required in the event Keystone was acquired.

<u>Mereen Defects to NW Hardwoods</u>

69.     In early December 2016, the principals of Keystone were still awaiting the final approval of NW Hardwoods.

70.     On December 8, 2016, Ellis and Steffens were contacted by Mereen while they were leaving town on a business trip to Ohio.  Mereen asked to meet immediately. Ellis and Steffens met him later that day at a rest stop off the Pennsylvania Turnpike.

71.     At this meeting, Mereen asked Steffens to sign Mereen's notice of resignation from Keystone. Upon questioning, Mereen confessed (after originally denying) that he was leaving Keystone to work for NW Hardwoods and that his decision resulted from direct negotiations with Keeling. Upon learning that, Ellis refused to sign anything and asked for the notice back, which Mereen then relinquished. A copy of this notice is attached as Exhibit 14. Under questioning, Mereen stated that he was doing this

to "protect his family," which seemed odd to Ellis and Steffens knowing that Keystone still had an offer out with NW Hardwoods and were in active negotiations with another party, as described *infra*.

72.    At the December 8th "rest stop meeting," Meeren acknowledged the NDA between Keystone and NW Hardwoods and that he would conduct his work with NW Hardwoods abiding by that NDA.

<u>NW Hardwoods Breaks off Negotiations</u>

73.    On December 12, 2016, four days after the "rest stop incident," Keeling informed Keystone's Investor on a telephone call that the proposed transaction would not occur. The Investor asked if NW Hardwood was proposing a counter offer, to which Keeling replied that the deal was not going to be moving forward at all.

74.    On December 15, 2016, Keystone acknowledged NW Hardwood's withdrawal by email and requested the return of confidential information. A copy of this email is attached hereto as Exhibit 15.

75.    No response was ever received to the December 15th email.

76.    Mereen submitted his formal resignation in writing on December 16, 2016; however, he was no longer effectively employed after December 8, 2016.  Prior to that date, he was working actively on behalf of NW Hardwoods to steal the business of Keystone Solutions at the Inland Port.

<u>Keystone's Other Suitor:  World Distribution Services</u>

77.    From the outset of the negotiations between Keystone and NW Hardwoods, Keystone was engaged with another interested party about a potential deal—World Distribution Services ("WDS"). WDS is a shipping logistics and warehousing company based in Cleveland, Ohio with a similar mission to Keystone, i.e. more efficiently moving

American products for export. WDS was interested in expanding its product market to include forestry products, getting a foothold in the Inland Port, and utilizing Keystone's proprietary models to maximize its own logistics.

78.    On March 21, 2016, the Investor hosted an introductory call lasting approximately one hour between the officers of WDS and Keystone. Both parties agreed that there was an interest in acquisition—however, WDS had higher priority items at the time and could not devote itself to the discussions until the fall of 2016.

79.    Beginning in October 2016 (while NW Hardwoods was doing its own due diligence), the parties exchanged communications confirming WDS' interest in Keystone. On October 19, 2016, the president of WDS conducted a lengthy site visit and presentation—similar to NW Hardwoods' September 1st meeting, discussed *supra*.

80.    On November 3, 2016, the parties entered into a NDA—substantially similar to the one entered with NW Hardwoods—to permit the parties to exchange confidential information. A copy of this NDA is attached as Exhibit 16. On November 14, 2016, WDS sent a list of documents it required from Keystone to pursue the acquisition further. Those documents were subsequently provided by Keystone.

81.    Following Mereen's defection and NW Hardwoods' ensuing decision to break off negotiations, Keystone began to pursue its deal with WDS in earnest.

82.    On December 8-9, 2016, immediately after the "rest stop incident" with Mereen, Steffens and Ellis had extensive meetings with WDS's officers at their corporate headquarters in Cleveland, Ohio.

83.    These December meetings were followed by a five-hour conference on January 6, 2017 between Keystone and WDS principals addressing details related to the operating model and marketing plan for Keystone's business proposal.

84.     Subsequently, WDS' President requested that Keystone provide a detailed marketing plan for the business.  On January 24th, 2017, Ellis submitted the Marketing Plan to WDS. A copy of this Marketing Plan is attached as Exhibit 17.

### Keystone Enters Letter of Intent with WDS

85.     On January 31, 2017, the WDS discussions culminated in a "Letter of Intent" ("LOI") from WDS to Keystone for the acquisition of Keystone. A copy of this LOI is attached hereto as Exhibit 18.

86.     Pursuant to the LOI,[6] the parties agreed to a base purchase price of $779,129.09. Exh. 18 at 1. In addition, WDS agreed to (i) settle Keystone's debt to Inland Port, *see supra,* in the maximum amount of $125,000; (ii) settle Keystone's debt to its equipment providers in the maximum amount of $50,000; and (iii) provide executive positions going forward for certain principals of Keystone. *Id.* at 1-2

87.     Notably, this purchase price had been significantly reduced from fall 2016 by the loss of Mereen (and need to recruit a new President) as well as the loss of NW Hardwoods as its primary customer.

88.     In all these calculations, Keystone's Lease with VIT—and its transferability to WDS—was a critical assumption relied upon by WDS when it made its offer. *Id.* at 2.

89.     On February 2, 2017, WDS signed the LOI and returned it to Keystone.  At that point, Keystone had every expectation that it would complete the transaction with WDS and successfully transfer its business, albeit for a reduced price.

### VIT Pulls the Plug on Keystone Lease

---

[6]     The Letter of Intent and any proposed deal did not waive Keystone's right to pursue claims against Mereen and NW Hardwoods for actions which had devalued the company.

90.     On February 7, 2017, without warning, WDS' president called Steffens and Ellis to rescind the LOI. Specifically, WDS' president stated that VIT's CIO, Joseph Ruddy ("Ruddy"), had informed WDS that a formal notice of default, a demand letter for lease payments in arrears, and a termination of the lease agreement had been recently sent to Keystone by certified courier and email. WDS' president further stated that VIT was not interested in discussions with WDS (or Keystone) as they were engaged in "advanced discussions" with an unnamed party to assume Keystone's Lease.

91.     As of February 7, 2017, no such documents regarding its Lease at the Inland Port had been received by Keystone.

92.     On February 10, 2017, WDS formally rescinded the LOI. A copy of this letter is attached hereto as Exhibit 19.

93.     In its letter of rescission, WDS stated that the basis for its decision was that "VIT was already well underway in discussions with another unnamed party to take over [Keystone's Lease] and provide similar transload services. As a result, VIT . . . simply could not engage with us in any conversations that would involve the current [Keystone] site at the [Inland Port] in Front Royal or the operations currently conducted by [Keystone] on that site." Exh. 19.

Keystone's Relationship with VIT

94.     As stated *supra*, the Inland Port Lease was the fundamental underpinning of Keystone's business.  Following the failure of an international customer to pay for a significant logging shipment, Keystone fell behind on its Lease obligations in early 2016, even as it was investing $500,000 in leasehold improvements.

95.     Immediately, Keystone moved to assure its landlord VIT that the arrears would be paid off and that it was implementing a plan for sustained profitability while also seeking an acquisition, i.e. the proposed transactions with NW Hardwoods and WDS.

96.     On March 30, 2016, Ellis had a telephone call with a vice-president of VIT, Matthew Barnes-Smith ("Barnes-Smith").  In this conversation, Barnes-Smith stated that Keystone needed a plan to settle its outstanding Lease obligations and handle the monthly payments going forward.  Ellis agreed to prepare it.

97.     Shortly thereafter, Keystone presented VIT with its business model going forward and stated that it could make current Lease payments while it continued to work on the back rent. Keystone also remitted a $10,000 payment (i.e. the monthly lease)—the receipt of which was acknowledge by Barnes-Smith in an April 4, 2016 email.

98.     Later that same day (April 4, 2016), Ellis sent an email to VIT to confirm the party's understanding:  that (i) Keystone had recently invested $500,000 in its facilities at the Inland Port, (ii) that it was committed to timely paying Lease payments going forward and (iii) it would pay the back rent as it got through the pending financial issues. A copy of this email is attached hereto as Exhibit 20.

99.     From April 4, 2016 going forward, Keystone met its requirements under the plan and stayed current on its Lease obligations going forward from that date.  It received no default notices from VIT until February 15, 2017.

<u>Keystone Alerts VIT to Potential Deal</u>

100.    On June 1, 2016, Ellis reached out to VIT to have a meeting to discuss its "large commercial opportunity" with NW Hardwoods to handle their export business. A copy of this email is attached as Exhibit 21. Specifically, Ellis needed VIT's approval of the warehouse structure to be constructed, as discussed *supra*.

101.    On July 26, 2016, while the NW Hardwoods negotiations were underway, Steffens and Ellis meet with Barnes-Smith, Ruddy, and other VIT employees to discuss Keystone's business model and growth, as well as the payment of its outstanding balance. Following presentations about Keystone's business model, Barnes-Smith stated (i) his appreciation for the efforts of Keystone to retire its debt and build a long-term relationship with the Inland Port and (ii) that he would arrange a presentation of Keystone and NW Hardwood's proposed business plan to the CEO of VIT, John Reinhart.

102.    Ellis responded with an email confirming the contents of the meeting and requesting: 1) an accounting of what was due; and 2) assistance from VIT for the proposed expansion pursuant to Keystone's deal with NW Hardwoods. A copy of this email is attached hereto as Exhibit 22.

103.    At that time, Ellis and Barnes-Smith confirmed the balance as of the end of July 2016 ($98,850.94) and that VIT was willing to discuss the expansion, which offered a long-term benefit for the Inland Port. Exh. 22 at 1.

104.    On September 2, 2016, Ellis emailed Barnes-Smith requesting a phone call to share "very positive news." In a phone call that evening, Ellis informed Barnes-Smith about the September 1st meeting with NW Hardwoods.

105.    Specifically, Ellis informed Barnes-Smith that NW Hardwoods was very interested in purchasing Keystone and that due diligence had begun with the closing likely to occur near the end of 2016. Ellis confirmed that any sale would include a requirement to settle Keystone's outstanding obligations to VIT.

106.    In response, Barnes-Smith shared his congratulations and stated that he would intercept a proposal that VIT's legal department had been drafting to set up a payment plan for the amount in arrears—as that amount would now be paid at the closing

of Keystone's sale. At the end of the call, Ellis promised to keep VIT apprised of the acquisition plans moving forward, which Keystone did.

107.    The parties continued their status quo—with Keystone continuing to pay the current rent and waiting to pay off the arrears until its deal closed.

VIT Cuts off Communications Regarding Lease

108.    Three months later, on December 1, 2016, Ellis wrote Barnes-Smith and Ruddy informing them that Keystone was now in active, due diligence with two corporations, i.e. NW Hardwoods and WDS. A copy is attached as Exhibit 23.

109.    Ellis again confirmed that no matter which purchaser ended up acquiring Keystone, the obligations to VIT would be satisfied. Ellis further confirmed that Keystone "expect[ed] firm direction in the form of an LOI by the end of the year." Exh. 23 at 2.

110.    In response, Barnes-Smith moved to set up a conference call.  Before the dates was set, NW Hardwoods rejected any proposed acquisition of Keystone.

111.    Barnes-Smith did not call back and the conference call never occurred. Meanwhile, Keystone continued making monthly payments.

112.    Upon information and belief, NW Hardwoods and/or Mereen (on behalf of NW Hardwoods) contacted VIT in late 2016 and became actively engaged in negotiations to take over the Lease and the improved Premises, without the knowledge or consent of Keystone.  As a result, VIT became hostile to the interests of Keystone.

<u>VIT Kicks Out Keystone and Transfers Premises</u>
<u>(with Improvements) to NW Hardwoods</u>

113.    On February 7, 2017, Ellis emailed Barnes-Smith and other officers of VIT a copy of the recently-signed LOI with WDS. A copy of this email is attached as Exhibit 24. No response was received to this communication.

114.    The February 7th email was followed up the next day with another request from Keystone to speak with VIT about the opportunity with WDS. A copy of this email is attached as Exhibit 25.  Again, there was no response.

115.    On February 10, 2017, Keystone received formal notice that its LOI had been rescinded after VIT informed WDS that the Lease was being terminated and that "VIT was already well underway in discussions with another unnamed party[, i.e. NW Hardwoods,] to take over the property and provide similar transload services." Exh. 19.

116.    On February 15, 2017, Keystone received a copy of a letter of default (the "Letter of Default") dated "January 13, 2017," which had been ostensibly delivered to Keystone's prior corporate address. A copy of this letter is attached hereto as Exhibit 26. No copy of this letter was emailed to Keystone nor was its contents communicated in person or by telephone—despite the frequent communications between Keystone and VIT in early 2017.

117.    Contrary to the assertions reported by WDS, the Letter of Default was only a five-day letter to cure, as required by the Lease, and explicitly states that it "shall not constitute a termination of the Agreement." Exh. 26 at 2.

118.   On March 3, 2017, with no possibility of a sale—due to the news that VIT would not allow for a transfer of its Lease to WDS—and having lost its key customer (NW Hardwoods) and President, Keystone ceased operations at the Inland Port.[7]

119.   On that same day, NW Hardwoods assumed the Premises formerly held by Keystone.  It now operates at the Premises, using the same infrastructure and equipment that it was originally shown by Keystone in the summer of 2016.  In effect, it has taken over the business without paying a nickel.

Underhanded Actions of Mereen
On Behalf of NW Hardwoods

120.   Prior and subsequent to his departure from Keystone, Mereen undertook a number of actions to undermine Keystone's interests. As the former president of Keystone, Mereen was aware of the financial challenges Keystone faced, including the Lease arrears and the lien on its equipment at the Premises.

121.   Mereen was likewise aware through his participation in various corporate negotiations that any purchase of Keystone was contingent upon the transfer of the Lease interest and the associated improvements.

122.   Upon information and belief, during these secret negotiations and subsequent to his hiring by NW Hardwoods, Mereen shared and utilized confidential information that was subject to the NDA, including (i) the Lease status of Keystone and relationship with VIT, (ii) the availability of Keystone's equipment, and (iii) the availability of its employees, should its business close.

---

[7]   When it entered into the LOI with WDS, Keystone coordinated with the note-holder for its equipment for a full payment of the note upon its equity sale (as represented by the LOI). When the sale fell through, Keystone was no longer able to pay that obligation and surrendered the equipment to the lienholder.

123.    While still employed by Keystone, Mereen reached out to Keystone's equipment lenders to obtain Keystone's equipment on behalf of his future employer NW Hardwoods following a default by Keystone.

124.    Mereen was further in contact with Keystone's fumigation services to have them transfer their fumigation permits to NW Hardwoods following a termination/default by Keystone. A copy of this permit (the "Permit"), as issued by the Virginia Department of Environmental Quality, is attached hereto as Exhibit 27. This Permit was good for five (5) years before renewal.

125.    This Permit is notable because, as described *supra*, having the fumigation services available at the Inland Port facilities was a significant factor in Keystone's business model and the Permit was an exclusive permit for fumigation at the Inland Port.

126.    Keystone never consented to transferring the Permit to any other party and the Permit remains active.

127.    On March 18, 2017, just two weeks after Keystone closed, an employee for NW Hardwoods (Michael Rayburn) filled out an Ownership/Name Change form ("Change Form") for the Permit. A copy of this form is attached hereto as Exhibit 28. This name change was on behalf of a NW Hardwoods and was for "3rd party loading of inter-modal containers [sic] fumigation of logs using methyl bromide."[8] Exh. 28 at 7.

128.    On March 21, 2017, Mereen signed a "Document Certification Form" certifying under penalty of law, pursuant to 9 VAC 5-20-230B, that the Change Form was filled out under his supervision and was true, accurate and complete. *Id*. at 5. Put more succinctly, Mereen—acting as the "Log Export Lead" for NW Hardwoods—certified under

---

[8]    This was the same method of fumigation employed by Keystone. *See* Exh. 27.

penalty of law that NW Hardwoods was conducting the *exact same work* at the *exact same facilities* using the *exact same permit*.

129.   Moreover, following his departure from Keystone, Mereen solicited Keystone employees to work for NW Hardwoods, even while Keystone was still in active negotiations with WDS.

130.   After Keystone's cessation of operations, on March 7, 2017, Mereen reached out on behalf of NW Hardwoods to hire no fewer than three former employees from Keystone. Copies of these employment emails are attached as Exhibit 29.

131.   As a result of his dishonest and nefarious actions which led to NW Hardwoods opening a business unit at the Inland Port, Mereen fatally injured the business of his former employer Keystone and advanced the interests of his new employer, NW Hardwoods.

132.   In regard to NW Hardwoods, it has established a profitable new business unit at the Inland Port which (i) utilizes the former leasehold of Keystone; (ii) utilizes the former equipment of Keystone; (iii) utilizes the former employees of Keystone, including its former President, Logistics Manager, Customer Service and Inside Sales Representative, Inventory Control Manager, Operations Supervisor, and all of its equipment operators; (iv) utilizes the environmental permits first obtained by Keystone; and (v) expressly relies on the business plan and financial figures of Keystone as provided during the 2016 due diligence period.

133.   All of this information was provided pursuant to the NDA, which NW Hardwoods signed – and then brazenly ignored in opening up its own business (and sabotaging Keystone's business) at the Inland Port.

**COUNT I — VIOLATION OF TRADE SECRETS ACT**

**(Northwest Hardwoods)**

134.    Keystone incorporates and restates the allegations of Paragraphs 1-133 as if fully set forth herein

135.    The confidential proprietary information, i.e. "the Logistics Proposal," that Keystone provided to NW Hardwoods pursuant to the August 2016 NDA constituted a "trade secret" as that term is defined by 18 U.S.C § 1839(3).   That combination of information included:  (1) the means and cost of shipping of raw logs[9] from various points to the Inland Port and onward to the Port of Norfolk; (2) the means and costs of fumigating and trans-loading the logs arriving at the Inland Port; (3) the access to skilled labor necessary for providing on-site services at the Inland Port; (4) the logistical software necessary to optimize loading and maximize cost savings; (5) the list of end users for the exportation of the logs; (6) the negotiated price and infrastructure of the Lease, consisting of industrial space and improvements at the Inland Port; (7) the estimated costs (fixed and variable) to provide the equipment and labor for the trans-loading; (8) the pro forma economic projections of the Proposal, including the profitability arising therefrom; and (9) the market demand for the Proposal (collectively, the "Trade Secrets").  The totality of this data was not readily ascertainable by any legal means.

136.    Keystone undertook reasonable measures to keep the Trade Secrets private, including the following:

      a.  Access to the trade secrets was restricted to high-level employees;

---

[9]    While the Proposal generally referred to logs, the same technology and savings applied to lumber. *See* Exh. 13 at 1 ("While the model is populated on a comparative study [of log trades], the economics are the same regardless of the commodity, including lumber."

    b.   Prospective business partners, including NW Hardwoods, were required to sign non-disclosure agreements prior to receiving access to the trade secrets. *See e.g.* Exh. 9.

    c.   The Premises itself was kept secure at all times.

137.   NW Hardwoods obtained the Trade Secrets of Keystone through Keystone's voluntary disclosure of them following the entry of the NDA. *See id.* At all times when NW Hardwoods held this confidential information, it had reason to know the information was confidential and that it did not have authorization to use it for its own purposes.

138.   NW Hardwoods misappropriated the Trade Secrets of Keystone when it utilized the Trade Secrets after receiving them under circumstances giving rise to a duty to maintain the secrecy of the trade secret. *See id.* Specifically, those circumstances were (i) the terms of the NDA it signed prior to the receival of the trade secrets; (ii) the confidential nature of the ongoing negotiations for the parties' joint venture; and (ii) the communication from Keystone requesting the return of all trade secrets at the conclusion of the relationship.

139.   Additionally, upon information and belief, NW Hardwoods obtained Trade Secrets through its recruitment and employment of Mereen—the President of Keystone.

140.   As the former President, Mereen had intimate knowledge of the valuable Trade Secrets of Keystone and their market potential.

141.   As a consequence, Keystone is entitled to recover from NW Hardwoods damages reflecting the direct damages to Keystone and the unjust enrichment to NW Hardwoods pursuant to 18 U.S.C. § 1836(b)(3)(B)(i).

142.   The actions of NW Hardwoods are the result of willful and malicious conduct or otherwise manifest a knowing and reckless indifference toward, and disregard

of, the rights of Keystone justifying an award of exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

143.    Keystone is likewise entitled to its attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and prejudgment interest.

## COUNT II — BREACH OF CONTRACT
## (Northwest Hardwoods)

144.    Keystone incorporates and restates the allegations of Paragraphs 1-143 as if fully set forth herein.

145.    Keystone and NW Hardwoods were both parties to a contract—the NDA, as described *supra*. Exh. 9. The parties entered into this contract "for the purpose of preventing the unauthorized disclosure of confidential and proprietary information as defined below." *Id*. at 1. This contract was supported by good and valid consideration: that both parties promised to forego using the other's confidential information. *Id*.

146.    This NDA defined confidential information as "all information or material that has or could have commercial value or other utility in the business in which Disclosing Party is engaged." *Id*.

147.    Pursuant to this NDA, as described above, the Trade Secrets were shared with NW Hardwoods via an online "Google Drive" (accessible only to certain persons), through secured email messages, and during the meetings between the two parties during the due diligence phase.

148.    This NDA created certain obligations on NW Hardwoods when it received confidential information.   Namely, to "hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of [Keystone]. . . . [NW

Hardwoods] shall not, without prior written approval of [Keystone], use for [NW Hardwood's] own benefit . . . any Confidential Information." *Id.*

149.    Finally, at the conclusion of the party's relationships, NW Hardwoods was to "return to [Keystone] any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if [Keystone] requests it in writing." *Id.*

150.    Keystone made such a request on December 15, 2016. No reply was received nor were any materials or information returned.

151.    Additionally, through its misappropriation of the Trade Secrets, NW Hardwoods is benefiting from its receipt of Keystone's confidential information without the permission of Keystone.

152.    Both NW Hardwood's failure to respond as well as their misappropriation of Keystone's confidential information constitute breaches of the NDA.

153.    Keystone has fulfilled all of its obligations under the NDA.

154.    As a result of NW Hardwood's breaches, Keystone has been damaged to the extent its valuable Trade Secrets were taken by NW Hardwoods resulting in the entire loss of its company.

### COUNT III — BREACH OF FIDUCIARTY DUTY
### (Mereen)

155.    Keystone incorporates and restates the allegations of Paragraphs 1-154 as if fully set forth herein.

156.    As the President of Keystone, Mereen owed certain fiduciary duties, including the common law duty of loyalty. These duties required that, *inter alia*, Mereen not act in a way to harm the business of Keystone or compete with Keystone.

157.    Mereen violated his fiduciary duties and/or common law duty of loyalty by misappropriating Keystone's Trade Secrets and giving them to NW Hardwoods. Mereen further violated his fiduciary duties and common law duties of loyalty when he attempted to recruit Keystone's employees, equipment lien holders, and fumigation facilities to work with NW Hardwoods.

158.    These actions were undertaken with the expectation that Keystone would be destroyed as a company. Indeed, Mereen reached out to Keystone's employees, equipment lien holders, and fumigation facilities—sometimes even prior to his resignation—to attempt to "retain" them at the Premises where they would perform the same work with NW Hardwoods.

159.    As a result of Mereen's breaches, Keystone has been damaged to the extent the entire value of its business has been taken by NW Hardwoods.

## COUNT IV — AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Northwest Hardwoods)

160.    Keystone incorporates and restates the allegations of Paragraphs 1-159 as if fully set forth herein.

161.    As the President of Keystone, Mereen owed certain fiduciary duties, including the common law duty of loyalty. These duties required that, *inter alia*, Mereen not act in a way to harm the business of Keystone or compete with Keystone.

162.    Mereen violated his fiduciary duties and/or common law duty of loyalty by misappropriating Keystone's Trade Secrets and giving them to NW Hardwoods. Mereen further violated his fiduciary duties and common law duties of loyalty when he attempted to recruit Keystone's employees, equipment lien holders, and fumigation facilities to work with NW Hardwoods.

163.    These actions were undertaken with the expectation that Keystone would be destroyed as a company. Indeed, Mereen reached out to Keystone's employees, equipment lien holders, and fumigation facilities—sometimes even prior to his resignation—to attempt to "retain" them at the Premises where they would perform the same work with NW Hardwoods.

164.    NW Hardwoods was aware of Mereen's fiduciary duties owed to Keystone as it only met Mereen through his then-employment with Keystone. NW was likewise aware of Mereen's breaches of his fiduciary duties to the extent they were undertaken for the sole benefit of NW Hardwoods.

165.    NW Hardwoods aided and abetted the breach of Mereen's fiduciary duties to the extent such breaches were performed on behalf of NW Hardwoods as a part of its concerted efforts to steal the business of Keystone.

166.    As a result of Mereen's breaches, as aided and abetted by NW Hardwoods, Keystone has been damaged to the extent the entire value of its business has been taken by NW Hardwoods.

### COUNT V — TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND PROSPECTIVE BUSINESS RELATIONS (Mereen and Northwest Hardwoods)

167.    Keystone incorporates and restates the allegations of Paragraphs 1-165 as if fully set forth herein.

168.    In early 2017, Mereen and NW Hardwoods had both actual and constructive knowledge of Keystone's pending transaction with WDS for the sale of its business, albeit at a reduced price.

169.    Mereen and NW Hardwoods intentionally interfered with this pending transaction using unlawful means, namely by using proprietary information obtained from Mereen (the former CEO) and/or from data obtained under the NDA, i.e. information which it was legally bound to not use against Keystone.

170.    Instead, using that information, Mereen and Northwest Hardwoods contacted VIT and sought the Premises which Keystone had improved and designed specifically for the Proposal.

171.    As a result of Mereen and NW Hardwoods' unlawful actions, Keystone was damaged through its inability to consummate its sale with WDS.

### COUNT VI — COMMON LAW AND STATUTORY BUSINESS CONSPIRACY (Mereen and Northwest Hardwoods)

172.    Keystone incorporates and restates the allegations of Paragraphs 1-163 as if fully set forth herein.

173.    In the weeks prior to December 8, 2016 (when Mereen first gave notice of his intention to resign from Keystone and join NW Hardwoods), NW Hardwoods and Mereen engaged in discussions regarding Mereen's assistance in taking over the business and leasehold of Keystone. These discussions then continued after he left the employment of NW Hardwoods.

174.    Upon information and belief, these discussions involved NW Hardwoods requesting—or Mereen offering—that Mereen violate his fiduciary duties and common law duty of loyalty owed to Keystone through various wrongful acts, including the misappropriation of Keystone's Trade Secrets.

175.    Upon information and belief, Mereen acted in such a manner to violate his fiduciary duties, and his common law duty of loyalty through misappropriating

Keystone's Trade Secrets and giving them to NW Hardwoods. Mereen further violated his fiduciary duties and common law duties of loyalty when he recruited Keystone's employees, equipment lien holders, and fumigation facilities to transfer their loyalty and services with NW Hardwoods.  Finally, he breached his duty of loyalty in informing his new employer (NW Hardwoods) of Keystone's financial situation and its outstanding balance with VIT, which Keystone then used to sabotage the WDS deal and eventually take over the Premises.

176.    These actions were undertaken with the expectation that Keystone would be destroyed as a company. Indeed, Mereen reached out to Keystone's employees, equipment lien holders, and fumigation facilities—sometimes even prior to his resignation—to attempt to "retain" them at the same leasehold where they would perform the same work with NW Hardwoods.

177.    Further, these actions were malicious and done with the intent to harm the business of Keystone.

178.    At the times of these acts, Mereen was not an employee of NW Hardwoods.

179.    As a result of the conspiracy between NW Hardwoods and Mereen, Keystone has been damaged to the extent the entire value of its business has been taken by NW Hardwoods resulting in the entire loss of its company—which was still valued by WDS at nearly $1,000,000 despite the ongoing conspiracy.

180.    In sum, the actions of NW Hardwoods and Mereen represent wrongful acts taken for a wrongful purpose, namely to damage Keystone in its trade and business. Those actions were successful in destroying the business of Keystone.

181.    The conspiracy between NW Hardwoods and Mereen constitutes both common law conspiracy as well as statutory conspiracy pursuant to Virginia Code § 18.2-499. Keystone is entitled to treble damages and its attorneys' fees.

WHEREFORE, Keystone is entitled to the following recovery herein against the Defendants jointly and severally:

■    Compensatory damages in the amount of $55.0 million representing both the value of Keystone's business and the unjust enrichment accruing to Northwest Hardwoods as a result of its illegal actions;

■    Exemplary damages as requested herein for the misappropriation of trade secrets, which shall be doubled under 18 U.S.C. § 1836(b)(3), and for the business conspiracy, which shall be trebled under Va. Code § 18.2-500;

■    Punitive damages in the maximum amount permitted by law;

■    Attorney fees as requested herein and prejudgment interest;

■    Such other relief as the Court might deem equitable.

KEYSTONE TRANSPORTATION
SOLUTIONS, LLC

By: _____/s/_____
J. Chapman Petersen, Esq., VSB #37225
David L. Amos, Esq., VSB #87271
CHAP PETERSEN & ASSOCIATES, PLC
3970 Chain Bridge Road
Fairfax, VA 22030
Telephone 703.277.9704
Facsimile 703.591.9285
*Counsel for Keystone*