IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

KEYSTONE TRANSPORTATION                )
SOLUTIONS, LLC,                        )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )       Civil Action No. 5:18-cv-00039
                                       )
NORTHWEST HARDWOODS, INC., *et*        )       By: Elizabeth K. Dillon
*al.*,                                 )            United States District Judge
                                       )
        Defendants.                    )

**MEMORANDUM OPINION**

Plaintiff Keystone Transportation Solutions, LLC (Keystone) filed this action against

Northwest Hardwoods, Inc. (NWH) and Thomas Mereen and alleges the following interrelated

claims, all of which arise from their business dealings and subsequent events: misappropriation

of trade secrets, breach of contract, breach of fiduciary duty, aiding and abetting the breach of

fiduciary duty, tortious interference with contractual relations, and business conspiracy.  Pending

before the court is defendants' motion for summary judgment, seeking judgment as a matter of

law on all six counts.  (Dkt. No. 63.)  The motion has been fully briefed and argued before the

court.  For the reasons set forth herein, the motion for summary judgment will be granted as to

Keystone's aiding and abetting the breach of fiduciary duty claim and denied as to all other

claims.

# I. BACKGROUND[1]

Keystone was a logistics company that specialized in the export of forest products and operated from the Inland Port of Virginia (VIP). David Steffens and Williams Ellis were the founders of Keystone. Steffens served as its CEO, and Ellis served as its CFO.

Prior to Keystone's creation, Ellis and Steffens conducted research about transportation inefficiencies in the forest products market. Specifically, they found that the industry's reliance on trucking, with greater weight restrictions and increased fumigation costs, was inefficient. This led them to create Keystone. To operate at the VIP, Keystone acquired a license from Virginia International Terminals (VIT) beginning August 1, 2015, and continuing until the earlier of July 31, 2020, thirty days after written notice of termination, or immediately if terminated following an Event of Default. The license agreement allowed assignment only with the written consent of the VIT and provided that Keystone would assign any permits or licenses for fumigation operations to the VIT or its designee upon termination of the agreement.

At the VIP, Keystone (1) established a central collection point for wood basket products; (2) fumigated those products on-site with a Department of Environmental Quality (DEQ) permit; (3) utilized direct access to freight trains running to Norfolk; (4) took advantage of the greater weight allowances on rail by transporting more product per load; and (5) corresponded with overseas customers for American hardwood. Keystone made $500,000 worth of real property investments and $1.5 million worth of capital investments during the license agreement period. The DEQ permit was exclusive to the site.

During the first few years of Keystone's existence, Steffens's research and experiences led him to develop the "Shipper Savings Model" (SSM). Steffens considered the SSM to be

---

[1] In setting forth this background, the court construes the evidence, and the reasonable inferences therefrom, in the light most favorable to Keystone, the non-moving party. *Laing v. Fed. Express Corp.*, 703 F.3d 713, 714 (4th Cir. 2013).

Keystone's most valuable trade secret. SSM's "high level conclusions" were not unique, but its specific findings on savings were confidential. The information, modeling, and data underlying Keystone's shipping savings was kept confidential by securing Keystone's physical site, restricting access to high-level officers, and entering into non-disclosure agreements before disclosing information to other companies. Keystone's model could only be conducted at this specific site at the VIP—any attempted replication elsewhere would suffer from the same inefficiencies originally identified by Steffens and Ellis. (Ellis Aff. ¶¶ 2–5, Dkt. No. 92-54; Steffens Aff. ¶¶ 2, 5–11, Dkt. No. 92-52; Steffens Expert Report, Dkt. No. 77-5 at 69; August 2015 License Agreement 4, 9, Dkt. No. 81-52; March 2017 License Agreement 22, Dkt. No. 81-53.)

Northwest Hardwoods (NWH) is a supplier and manufacturer of hardwood. (Keeling Decl. ¶ 6, Dkt. No. 77-1 at 7.) On February 22, 2016, a formal introduction was made between NWH and Keystone, in which Mark Fornasiero, a Keystone board member, stated that Keystone had "an innovative approach to the supply chain for exporting hardwoods," and was "leveraging an exclusive partnership" that it had with the VIP. Around March 2016, Mike Knavenshue, NWH's transportation head, and Bo Hammond, NWH's head of log sales, visited Keystone's site at the VIP and met with Steffens and Ellis. During this meeting, Steffens and Ellis emphasized Keystone's ability to ship more logs per container and their onsite fumigation. (Ellis Aff. ¶ 7; NWH Follow-up Email, Dkt. No.77-4 at 83; Knavenshue Dep. 22–24, Dkt. No. 77-4 at 59.) The parties' business proposal involved NWH selling hardwood logs to Keystone, who would then aggregate, fumigate, and transport those logs to Keystone's foreign customers. In May 2016, the parties conducted a test run where NWH shipped its lumber to the VIP for Keystone to "stuff" in containers there and ship. (Ellis Aff. ¶¶ 7–8; Knavenshue Dep. 34–40.) Prior to the test run,

Steffens visited NWH's site to watch how it loaded lumber, and Knavenshue emailed Ellis about how he wanted the containers to be loaded. (Knavenshue Dep. 30, 40–41; Ellis Dep. 258, Dkt. No. 77-1 at 55.) Loading at the port during the test run gave NWH an additional $5,371.40 in revenue and allowed it to ship an additional 4,280 board feet. (Knavenshue Dep. 41–42.) Using its own data and observations from the test load, as well as the $600 ocean rates Ellis disclosed to Noel Adcock, NWH's transportation manager, NWH compared the cost of shipping lumber through the VIP versus by truck. (Keeling Decl. ¶ 23, Dkt. No. 77-1 at 1; Call Follow-up email, Dkt. No. 77-5 at 29.)

In July 2016, NWH and Keystone began discussing a joint venture for exporting log sales. In response to Ellis's outline of their potential business partnerships, Darrell Keeling, the COO of NWH, responded that NWH needed "to make sure [it is] as profitable with a partner as [it] would be on [its] own," and sought information about Keystone's profitability, stating, "of course, the last part of that statement will come with the information through the [non-disclosure agreement] NDA." (NWH Log Program email, Dkt. No. 92-8 at 1; Keeling Dep. 50–51, Dkt. No. 92-6 at 7.) On August 11, 2016, the parties signed an NDA. It defines "confidential information" as "all information or material that has or could have commercial value or other utility in the business in which Disclosing Party is engaged," and states that the disclosing party shall stamp written confidential material with the word "confidential." Under the NDA, the receiving party agreed to "hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of the Disclosing Party." (NDA, Dkt. No. 77-5 at 49–50.) After the NDA was signed, Keeling asked Ellis for Keystone's financial data "[s]ince we have an NDA." (Meeting Confirmation 9/1/16 email, Dkt. No. 92-10.) In response, Ellis shared "hard financial data" with Keeling. (Meeting Confirmation 9/1/16 email, Dkt. No. 92-11.) Keystone

4

believed that all electronically shared documents between the parties following the NDA were subject to the NDA.  (Ellis Aff. ¶ 10.)

On September 1, 2016, the parties held a meeting at the VIP, and afterwards, NWH sent Keystone a list of due diligence requests and stated: "[s]ince we are already under an NDA I think you should be comfortable in providing this."  (Ellis Aff. ¶¶ 12–15; Follow-ups from our meeting email, Dkt. No. 92-13 at 1.)  On September 6, 2016, Keystone sent NWH a model "to evaluate the logistics and transportation opportunities that [Keystone] offers."  (Re: Follow-ups from our meeting email, Dkt. No. 92-14.)  On September 19, 2016, Ellis created a password-protected Google Drive for specific individuals from NWH and Keystone, and uploaded the requested due diligence documents and Keystone's SSM to the Google Drive.  (Ellis Aff. ¶ 14.)  The SSM was an electronic spreadsheet that set forth a "coherent economic model of the sustained savings that would accrue to [NWH] both through logs and lumber on the export side" with "sustained analyses" that allowed the user to change the mill location, the destination of the logs and lumber, how the logs and lumber would be transported, and whether fumigation was needed.  Following the creation of the Google Drive, NWH also asked for Keystone's monthly balance sheets since January 2015.  (Steffens Dep. 288–90, Dkt. No. 77-1 at 71–72; Monthly Balance Sheets email, Dkt. No. 92-22.)

Between July and November 2016, Keeling and Thomas Mereen, who was the president of Keystone at that time and who is now the current log export lead at NWH, exchanged twenty-nine text messages and had fifteen phone calls (Phone Records, Dkt. No. 92-24), and on November 11, 2016, Mereen emailed Keeling, asking if he could work at NWH (Work Relationship email, Dkt. No. 92-26).  On November 14, 2016, Keeling emailed TJ Rosengarth, the CEO of NWH, sending him information about Keystone that was not publically available and

not otherwise known to the public. (Log Trading Proposal email, Dkt. No. 92-27.) Following this exchange, Keeling and Rosengarth planned for Knavenshue to approach Stan Crockett, an on-site port manager with the VIP, to "know what the real situation is with the lease." They discussed how to "coach" Knavenshue so he would "not telegraph NWH cutting [Keystone] out," and that they would do so "under [the] guise of due diligence for working with Keystone." (Log Trading Proposal email, Dkt. No. 92-30.) Crockett and Knavenshue spoke the next day. (RE: Call email, Dkt. No. 92-31.)

The day after that conversation, on November 16, 2016, Barnes-Smith, the business manager of the VIP, contacted NWH seeking a business partner for the log stuffing operations at the VIP. (Barnes-Smith Dep. 125–27, Dkt. No. 92-32.) Barnes-Smith communicated to Keeling that the VIP was "tired of dealing with" Keystone, and Keeling responded that NWH could take over the operation as soon as possible. (Barnes-Smith Voicemail email, Dkt. No. 92-34 at 2.)

On November 23, 2016, Keystone presented a $4 million offer for its purchase to NWH, and on November 29, 2016, Keeling told Ellis and Steffens that the Keystone acquisition was scheduled to be discussed at NWH's upcoming Board of Directors meeting. At this point, Keystone was not aware that NWH had been communicating with the VIP. (Ellis Aff. ¶¶ 19–20.) On December 1, 2016, Barnes-Smith circulated an internal memorandum that recommended sending a notice of default to Keystone (with a five-day cure period) and contacting NWH to take over the log stuffing operations at the VIP. (VIP Land License and Log Operations, Dkt. No. 92-37.)

On December 8, 2016, Mereen met with Steffens and Ellis to notify them that he was resigning and going to work for NWH. On December 12, 2016, Keeling notified Keystone that NWH would not be moving forward with the deal. Keystone never received a response from

NWH to its request for the return of its confidential information. (Ellis Aff. ¶¶ 22–23, 26–27.) Keeling attempted to contact Barnes-Smith twice following NWH's rejection of Keystone's offer. (Dkt. Nos. 92-38, 92-40.) While waiting for the VIP to send the notice of default to Keystone, Keeling expressed to the VIP that NWH was "standing by with the financial and human capital to take over the existing operation or start a new one." (VIP email, Dkt. No. 92-41.)

Throughout its negotiations with NWH and afterwards, Keystone also was discussing its potential purchase with World Distribution Services (WDS). On February 2, 2017, Keystone and WDS signed a letter of intent (LOI) about WDS purchasing Keystone and paying its debt to VIT in full. However, by letter dated February 10, 2017, WDS rescinded the LOI because it had been informed by the VIT that a notice of default had been sent to Keystone and that it was in advanced discussions with an unnamed party who would assume Keystone's license. (Ellis Aff. ¶¶ 21, 28, 31–32.) Although the notice of default was dated January 13, 2017, Keystone claims it was not aware of the notice until mid-February—after it entered into the LOI with WDS.[2] (Mem. Opp'n Mot. Summ. J. 13–14, Dkt. No. 92; Notice of Default, Dkt. No. 92-47.)

After WDS rescinded the LOI, Keystone ceased operations on March 2, 2017. (Ellis Aff. ¶¶ 33, 35.) On March 3, 2017, NWH executed a license agreement with the VIT for Keystone's former premises. (NWH License Agreement, Dkt. No. 92-51.) Since entering into this license agreement, NWH has performed the log loading services at the VIP. (Keeling Decl. ¶ 35.) There is no material difference between the work that was performed at the VIP by Keystone and the work that is performed now by NWH. (Mereen Dep. 34–35, Dkt. No. 92-48.)

---

[2] The notice of default gave Keystone five days to pay its outstanding balance and stated that it did not constitute a termination of the license agreement. (Notice of Default, Dkt. No. 92-47.)

Keystone asserts the following claims: 1) violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq.*, against NWH; 2) breach of contract against NWH; 3) breach of fiduciary duty against Mereen; 4) aiding and abetting the breach of fiduciary duty against NWH; 5) tortious interference with contractual relations and prospective business relations against NWH and Mereen; and 6) business conspiracy against NWH and Mereen. (Compl. 26–35, Dkt. No. 1.)

## II. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

## B. Specific Claims

### 1. Count One: The Defend Trade Secrets Act against Northwest Hardwoods

To make a claim under the Defend Trade Secrets Act (DTSA), a plaintiff must establish

that it owns a trade secret, that the trade secret was misappropriated, and that the trade secret

implicates interstate or foreign commerce. *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F.

Supp. 3d 845, 853 (E.D. Va. 2018). A trade secret is:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). For a claim under the DTSA, the plaintiff carries the burden to describe

"the subject matter of its alleged trade secrets in sufficient detail to establish each element of a

trade secret." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661 (4th Cir. 1993). As

such, the plaintiff must "identify, with particularity, each trade secret it claims was

misappropriated. This must be done to allow the finder of fact to distinguish that which is

legitimately a trade secret from other information that is simply confidential but not a trade

secret, or is publicly available information." *Kancor Ams., Inc. v. ATC Ingredients, Inc.*, No. 15–

CV00589–GBL–IDD, 2016 WL 740061, at *14 (E.D. Va. Feb. 25, 2016) (quoting

*MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 418 (E.D. Va. 2004)).

Whether or not a trade secret exists is a "fact-intensive question to be resolved at trial." *Decision Insights, Inc. v. Sentia Grp., Inc.*, 311 F. App'x 586, 592 (4th Cir. 2009) (quoting *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 419 (4th Cir.1999)). A plaintiff cannot simply produce lists of general information. *Stevens & Sons, Inc. v. JELD-WEN, Inc.*, 2018 WL 1796293, at *7 (E.D. Va. Apr. 16, 2018). Further, it is important that a trade secret not be readily ascertainable through legitimate means, because if it is, "the inference is that the information was either essentially 'public' or is of de minimis economic value." *Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 779 (E.D. Va. 2012) (quoting *MicroStrategy Inc.*, 331 F. Supp. 2d at 416–17). "However, it is also clear that a compilation of public facts can also constitute a trade secret if the compilation itself has remained confidential." *MicroStrategy,* 331 F. Supp. 2d at 417 (citing *Comprehensive Technologies Intern., Inc. v. Software Artisans, Inc.*, 3 F.3d 730, 736–37 (4th Cir. 1993)).

In addition, "[t]o prove 'misappropriation' of a trade secret, the plaintiff must establish two elements: (1) that the defendant acquired, disclosed, or used a trade secret developed by the plaintiff through improper means (namely, without express or implied consent); and (2) that the defendant knew or had reason to know that its knowledge of the trade secret was either acquired under circumstances giving rise to a duty to maintain its secrecy or derived through a person owing such a duty to the plaintiff." *Trident Prods.*, 859 F. Supp. 2d at 780; 18 U.S.C. § 1839(5). For a plaintiff to support its claim of misappropriation, it must use "actual objective *evidence*, not only *inference*." *Id.* at 780 (quoting *Othentec, Ltd. v. Phelan*, 526 F.3d 135, 142 (4th Cir. 2008) (emphasis added)). But, importantly, determining whether a trade secret has been misappropriated "is uniquely factual in nature because it ordinarily involves extensive

circumstantial evidence that must be evaluated against the direct evidence often presented by defendants in a trade secrets case." *MicroStrategy Inc. v. Li*, 601 S.E.2d 580, 589 (Va. 2004).

Keystone has defined what it considers its trade secrets to be, including the information underlying its logistics concept, its answers to NWH's due diligence requests, and the SSM. (Mem. Opp'n Mot. Summ. J. 15–16, Dkt. No. 92; Steffens Aff. ¶¶ 4–13, Dkt. No. 92-52; Compl. ¶ 135; Steffens Expert Report, Dkt. No. 92-53[3].) Additionally, despite NWH's assertions that it already knew, could readily ascertain, or had already implemented the methods and information shown to it by Keystone, it appears that NWH recognized the value of the information provided by Keystone. As their business dealings progressed, it agreed to sign the NDA prior to exchanging information and referenced the NDA before requesting further additional information from Keystone. Moreover, Rosengarth, NWH's CEO, stated that Keystone's principals would add value and had far more logistics experience, recognized that Keystone already had an established log yard connected to the port, and noted that Keystone had a viable fumigation service and permit. (Thoughts on JV Structure email, Dkt. No. 92-18.) Rosengarth considered Keystone to be a "very promising add-on business to NWH to grow exports of hardwood logs as well as provide a more cost effective means to export lumber," demonstrating NWH's interest in working with Keystone and its recognition of Keystone's model. (NWH Weekly Report September 7 email, Dkt. No. 92-17.) Keeling believed that the Keystone model worked better and captured costs more effectively than another model NWH was considering. (WDS and Keystone Freight Savings Comparison Calculator, Dkt. No. 92-19.)

Keystone has also described the years of research and experience that led Steffens and Ellis to develop these concepts for its business, and it asserted that NWH did not initially

---

[3] While the court is excluding the opinions of Steffens as *expert* testimony, his testimony as a fact witness with regard to the content of the alleged trade secrets is relevant.

understand the SSM and its benefits. Further, Keystone has described the reasonable measures that it took to keep its information secret at the VIP, including securing the physical site, restricting access to the information, and entering into a non-disclosure agreement before disclosing its information to other companies. (Steffens Aff. ¶¶ 4–8, 12–13.) Thus, there is a dispute of material fact as to whether Keystone's alleged trade secret were "publicly disclosed, commonly known, readily ascertainable, and already used by NWH," and therefore possessed no independent economic value, as NWH contends.

In addition, NWH now operates at the exact same site of Keystone's former operation and conducts a materially similar, if not identical, operation. Keystone has demonstrated that its business model—which now appears to be utilized in the same manner by NWH—was developed through its own expertise, research, and experience. (*See* Steffens Aff. ¶¶ 4–13; Steffens Expert Report.) NWH's implementation of this model at the VIP *immediately* followed Keystone's exit from the VIP, after the companies exchanged data and information under an NDA and after NWH had toured the VIP with Keystone and witnessed its operation firsthand.

Keystone argues that the material similarities between the businesses must have resulted from the disclosure of confidential information. In response, NWH cites to *Trident*, in which the court rejected a similar argument by the plaintiff. 859 F. Supp. 2d at 780. But *Trident* is distinguishable. There, the plaintiff failed to establish the existence of a trade secret at all and its evidence of misappropriation rested only on an inference. *Id.* In contrast, here, there is at least a dispute of material fact about the existence of trade secrets, and Steffens has described the unique nature of Keystone's business model, which Mereen admits it is now replicating. Even if NWH maintains that it did not use confidential information from Keystone, (Keeling Dep. 96–97; Keeling Dec. ¶ 25, Dkt. No. 77-1 at 10–11), these facts comprise the kind of "extensive

circumstantial evidence" that raises a dispute of material fact as to whether misappropriation occurred. *MicroStrategy Inc.*, 601 S.E.2d at 589.

For these reasons, there are genuine disputes of material fact for a jury to determine as to the Defend Trade Secrets Act claim.

### 2. Count Two: Breach of Contract against Northwest Hardwoods

In count two, Keystone alleges that NWH's misuse of its confidential information constituted a breach of the parties' NDA. Under Virginia law, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006). To prove a legally enforceable obligation, the plaintiff must prove (1) offer, (2) acceptance, and (3) consideration. *See Montagna v. Holiday Inns, Inc.*, 269 S.E.2d 838, 844 (Va. 1980) ("[T]here must be a complete agreement which requires acceptance of an offer, as well as valuable consideration.")

NWH argues that the NDA did not apply to the information disclosed to it by Keystone because it was available through legitimate means or already known to NWH, and that Keystone did not suffer any harm because NWH did not misuse confidential information. Moreover, if information was disclosed pursuant to the NDA, NWH failed to return it as required by the NDA. For the reasons discussed under the analysis for count one, there are genuine disputes of material fact as to both the existence of trade secrets (and thus a dispute about the independent economic value of the information) and the misappropriation of those alleged trade secrets. Further, NWH's alleged misappropriation of Keystone's trade secrets has, according to Keystone, allowed NWH to take over Keystone's former operation at the VIP and implement

Keystone's unique business model without purchasing Keystone's business, arguably causing NWH's unjust enrichment and loss to Keystone. Therefore, there are genuine disputes of material fact as to whether NWH is liable for breach of the NDA.

### 3. Count Three: Breach of Fiduciary Duty against Mereen

"A plaintiff may demonstrate a breach of the fiduciary duty of loyalty by showing that the defendant 'misappropriated trade secrets, misused confidential information, or solicited clients or other employees prior to termination of employment.'" *Contract Assocs., Inc. v. Atalay*, No. 1:14-cv-882, 2015 WL 1649051, at *3 (E.D. Va. Apr. 10, 2015) (quoting *Williams v. Dominion Tech. Partners, LLC*, 576 S.E.2d 752 (Va. 2003)). "To succeed on a claim for breach of fiduciary duty, a plaintiff must prove: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages resulting from the breach." *Contract Assocs., Inc. v. Atalay*, No. 1:14-cv-882, 2015 WL 1649051, at *3 (E.D. Va. Apr. 10, 2015).

Defendants maintain that Mereen did not share any trade secret information with NWH (Mem. Supp. Mot. Summ. J. 12–13) and attempt to refute Keystone's allegations that Mereen supplied confidential information to NWH by explaining that the calls and text messages between Mereen and Keeling prior to November 11, 2016, were related to either routine business matters or a potential joint venture for Keystone and NWH. NWH also provides context to the November 11 email—in which Mereen asked to work at NWH—by pointing out that a few hours earlier, Ellis emailed Mereen about the conversation he was about to have with Keeling, stating: "[Keystone] desires to engage in a dialogue that would move Tom Mereen over to NWH as a permanent employee." NWH also challenges Keystone's suggestion that Mereen provided the

information disseminated in Keeling's November 14 email, arguing that Keeling could have learned this information elsewhere.[4] (Reply Mem. Supp. Mot. Summ. J. 4–7, Dkt. No. 103.)

Contrary to NWH's assertion at the hearing, it has only explained some of the many phone calls and text messages between Mereen and Keeling in the fall of 2016. (Reply Mem. Supp. Mot. Summ. J. 4–6.) Additionally, while Ellis seems to have been aware that Mereen was going to seek employment at NWH, three days after Mereen emailed Keeling, on November 14, Keeling shared information about Keystone with Rosengarth and another NWH employee that was not available on the Google Drive and not publically available. Four days after Mereen emailed Keeling, on November 15, Keeling and Rosengarth planned for Knavenshue to approach Crockett "under [the] guise of due diligence for working with Keystone." (Log Trading Proposal email, Dkt. No. 92-30.) And on November 16, Barnes-Smith contacted NWH regarding the log stuffing operations because the VIP no longer wanted to work with Keystone. Viewed in the light most favorable to Keystone, the evidence of what occurred before and after the November 11 email, and in such close temporal proximity, raises genuine disputes of material fact as to whether Mereen misappropriated trade secrets or misused confidential information in breach of his fiduciary duty of loyalty to Keystone.

### 4. Count Four: Aiding and Abetting the Breach of Fiduciary Duty against Northwest Hardwoods

As to its aiding and abetting of Mereen's alleged breach of fiduciary duty, NWH asks the court to follow courts that have held there is no such claim, or to otherwise note that there is no evidence that NWH participated in any breach of fiduciary duty. (Mem. Supp. Mot. Summ. J. n.13); *see MicroStrategy Servs. Corp. v. OpenRisk, LLC*, No. 1:14-cv-1244, 2015 WL 1221263, at *3 (E.D. Va. 2015). Arguably, Keystone has waived this claim because it was not addressed

---

[4] NWH argues that Keeling could have learned this information through truck drivers who interacted with a freight forwarder with whom Keystone worked.

in its brief in response to NWH's motion for summary judgment and counsel for Keystone only referenced the claim in passing at the hearing. At the very least, Keystone failed to cite any authority in support of its bald assertion that this cause of action is cognizable. Therefore, the court will grant summary judgment as to count four.

### 5. Count Five: Tortious Interference with Contractual Relations and Prospective Business Relations against Northwest Hardwoods and Mereen

In count five, Keystone alleges that Mereen and NWH intentionally interfered with Keystone's pending transaction with WDS by unlawfully using information obtained from Mereen and/or data obtained under the NDA to contact the VIT and seek use of its premises. (Compl. ¶¶ 167–71.) To establish tortious interference with contractual relations and prospective business relations, Keystone must prove: "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." *Williams*, 576 S.E.2d at 757. "[T]he extent of permissible interference that Virginia will allow increases as the degree of enforceability of a business relationship decreases." *Bay Tobacco, LLC v. Bell Quality Tobacco Prod., LLC*, 261 F. Supp. 2d 483, 500 (E.D. Va. 2003).

NWH contends that that there was no probable future economic benefit or "reasonable certainty" that Keystone would have realized any expectancy with WDS because the LOI was conditioned on assignment of the Keystone license, which was objectively unachievable because Keystone had already received the notice of default from the VIT when it entered into the LOI. NWH also points out, and Keystone conceded at the hearing, that there is no evidence NWH contacted WDS directly. (Mem. Supp. Mot. Summ. J. 28–29.) In response, Keystone argues

that it was "unaware that it was losing its premises" when it entered into the LOI with WDS because the default notice had not been mailed to its location at the VIP and the notice of default did not invalidate the LOI because it states: "This letter shall not constitute a termination of the Agreement." (Mem. Opp'n Mot. Summ. J. n.12; Notice of Default.)

There is a genuine dispute of material fact as to the existence of a business relationship or expectancy here. While NWH argues that Keystone had received the notice of default when it entered into the LOI, Keystone contends that it had not received the notice of default and emphasizes that the notice of default itself was not a termination of its license agreement with the VIT. Further, NWH points out only that it never contacted WDS directly. It does not, however, specifically deny knowledge of the business relationship/expectancy between Keystone and WDS. Indeed, Mereen would have known of the WDS negotiations before he left Keystone for NWH.

In addition, the timing of the events at issue supports reasonable inferences in Keystone's favor on this claim. For example, Barnes-Smith contacted NWH about partnering together for the log stuffing operation at the VIP only five days after Mereen reached out to NWH and only one day after Knavenshue spoke to Crockett while avoiding "telegraphing" that NWH was cutting Keystone out. Notably, immediately preceding all of those contacts, Barnes-Smith had been content with Keystone being in arrears because he wanted Keystone to succeed and they were still stuffing logs at the VIP. (Barnes-Smith Dep. 85–87, 182–83.) Once Barnes-Smith and Keeling spoke, NWH wanted to "move quickly on meeting with [VIT]," so they would not "give Keystone a chance to put a deal together with anyone else." (Barnes voicemail email.) The timing, in particular, leads to a genuine dispute of material fact as to whether NWH knew of

Keystone's dealings with WDS when it reached out to the VIT and began discussing a partnership for the log stuffing operation at the VIP.

Further, WDS clearly rescinded the LOI because it discovered that the VIT was in advanced discussions with NWH to assume Keystone's license, demonstrating that, but for NWH's negotiations with VIT (whether those actions constituted intentional misconduct or not), there is at least some evidence supporting a reasonable certainty that Keystone would have continued in the relationship or realized the expectancy. Finally, Keystone was damaged by the failure of its negotiations with WDS because Keystone ended its operations. For these reasons, there are genuine disputes of material fact for a jury, so the court will not grant summary judgment as to the tortious interference claim.

### 6. Count Six: Common Law and Statutory Business Conspiracy against Northwest Hardwoods and Mereen

Keystone alleges that a conspiracy existed between Mereen and NWH, as evidenced by their discussions prior to December 8, 2016, for Mereen to help take over Keystone's business and license agreement by violating his fiduciary duties and duty of loyalty through misappropriation of trade secrets. Keystone further alleges that these actions were undertaken to destroy Keystone as a company. (Compl. ¶¶ 172–81.)

To prevail on its business conspiracy claim, Keystone must prove by clear and convincing evidence: "(1) concerted action; (2) legal malice; and (3) causally related injury." *Schlegel v. Bank of Am., N.A.*, 505 F. Supp. 2d 321, 325 (W.D. Va. 2007). Under the concerted action requirement, Keystone "must prove that the defendants combined together to effect a preconceived plan and unity of design and purpose." *Id.* at 326 (internal quotations and citations omitted). For legal malice, Keystone must show that "injur[ing] the plaintiff's reputation, trade, or business . . . was at least *one* of the purposes of the conspiracy." *Id.*

As discussed in addressing other counts, the events leading up to and following Mereen's November 11 email, including both Mereen and NWH's actions, raise genuine disputes of material fact as to misappropriation of trade secrets and/or misuse of confidential information. Additionally, NWH began its operation of a materially similar, if not identical, operation at Keystone's former premises immediately following the termination of Keystone's operations. This occurred after it received information from Keystone under an NDA and toured Keystone's facilities at the VIP. As noted previously, there are genuine disputes of material fact as to NWH's misappropriation of Keystone's alleged trade secrets. This, combined with the fact that Mereen and Keeling had fifteen phone calls and exchanged twenty-nine text messages between July and November 2016 is sufficient to create a factual dispute for the jury as to the business conspiracy claim.

III.  CONCLUSION

For the foregoing reasons, the court will grant defendants' motion for summary judgment as to Keystone's aiding and abetting the breach of fiduciary duty claim and will deny the motion as to all other claims. An appropriate order will be entered.

Entered:  April 19, 2019.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge