CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
4/22/2019
JULIA C. DUDLEY, CLERK
BY: S/J.Vasquez
           DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

KEYSTONE TRANSPORTATION )
SOLUTIONS, LLC, )
  )
   Plaintiff, )
  )
v. ) Civil Action No. 5:18-cv-00039
  )
NORTHWEST HARDWOODS, INC., *et al.*, ) By: Elizabeth K. Dillon
  )     United States District Judge
   Defendant. )

**MEMORANDUM OPINION**

Pending before the court are defendants' motions to exclude plaintiff's proffered expert, Brian Burns, and to strike Burns's rebuttal report. (Dkt. Nos. 66, 70.) For the reasons set forth below, the court will deny the motion to exclude Burns as an expert witness and deny the motion to exclude Burns's rebuttal expert report.

I. BACKGROUND[1]

Keystone was a logistics company that specialized in the export of forest products and operated from the Inland Port of Virginia (VIP). Leading up to its creation, Keystone's founders conducted research about transportation inefficiencies in the forest products market. Specifically, they found that the industry's reliance on trucking, with greater weight restrictions and increased fumigation costs, was inefficient. This research, and the experience gained over the first few years of Keystone's existence, led Steffens to develop the "Shipper Savings Model" (SSM). Steffens considered the SSM to be Keystone's most valuable trade secret. SSM's "high level conclusions" were not unique, but its specific findings on savings were confidential.

---

[1] The factual background underlying the entire case is covered in more detail in other opinions, such as the court's opinion on summary judgment, and the court will not repeat it here. For purposes of this motion, the court focuses on Burns and his damages calculations.

Keystone's model could only be conducted at this specific site at the VIP—any attempted replication elsewhere would suffer from the same inefficiencies originally identified by Keystone.

Keystone began negotiations regarding a business relationship with Northwest Hardwoods (NWH), a supplier and manufacturer of hardwood, in February 2016. In the months that followed, NWH conducted a "test run" through Keystone's site at the VIP and the parties exchanged information, including the SSM, following the signing of an NDA. Eventually, Keystone presented an offer for its purchase to NWH. NWH rejected that offer, but shortly after, Thomas Mereen, Keystone's president at the time, resigned and went to work at NWH. Unbeknownst to Keystone, NWH was investigating taking over the VIP site itself.

Keystone then turned its focus to its ongoing negotiations with another party, World Distribution Services (WDS). After the parties entered into a letter of intent for WDS to purchase Keystone's business, WDS rescinded the letter because it had been informed that a notice of default had been sent to Keystone and an unnamed party (NWH) would assume Keystone's license at the VIP. After WDS rescinded the letter of intent, Keystone ceased its operations on March 2, 2017, and on the next day, March 3, 2017, NWH executed a license agreement for Keystone's former premises. Since entering into this license agreement, NWH has performed the log loading services at the VIP.

Keystone alleges claims against defendants NWH and Mereen that arise from their business dealings and subsequent events. Defendants contend that Keystone was a failing business, the VIP first approached NWH, Keystone had no trade secrets, and defendants did not appropriate or use Keystone's trade secrets or violate the NDA. Keystone retained Brian Burns, director of Dixon Hughes Goodman LLP, to conduct valuation services and quantify economic

damages to Keystone allegedly caused by NWH's conduct. Keystone has offered two reports from Burns containing his opinions on the calculation of damages: his November 18, 2018 report and his January 10, 2019 rebuttal report. (Dkt. Nos. 99-2, 99-3.)

Defendants seek to exclude Burns's testimony, contending that his calculations of three measures of damages (disgorgement of NWH's profits and cost-savings from using trade secrets, reasonable royalty for trade secret use, and loss of business value) are misleading and unreliable because of flawed methodology. Defendants also ask that the court strike Burns's rebuttal report and testimony, contending that it exceeds the scope of rebuttal and presents new opinions to buttress initial opinions after flaws regarding those opinions were mentioned to him.

## II. DISCUSSION

### A. Legal Standards

Rule 702 of the Federal Rules of Evidence governs admissibility of expert testimony. The testimony of a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" is admissible if: "(1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact at issue; (2) the testimony is based upon sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

After an individual qualifies as an expert, this court has an obligation under *Daubert* to act as a gatekeeper and ensure that any testimony concerning scientific, technical, or other specialized knowledge offered in support of a party's claim is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting same). When testimony is based upon "technical" or "other

3

specialized knowledge," it is admissible if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) his methodology is sufficiently reliable; and (3) the testimony will assist the trier of fact by bringing the expert's knowledge to bear upon a fact in issue. *See Daubert*, 509 U.S. at 589–91. Thus, the court must determine whether the expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning or methodology was applied reliably to the facts, so as to be relevant and helpful to the jury. *See id.* at 591–92; *Kumho Tire Co.*, 526 U.S. at 147.

The proponent of the testimony must establish its admissibility, although it need not prove its expert's theory is correct. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *Maryland Cas. Co. v. Therm–O–Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998). Indeed, "[v]igorous cross examination, presentation of contrary evidence and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Nonetheless, "[t]he main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony." *Nease v. Ford Motor Co.*, 848 F.3d 219, 2131 (4th Cir. 2017) (citation omitted).

The Fourth Circuit has explained the *Daubert* standard as a "two-step gatekeeping function" required of trial courts. First, the trial court must ask whether proffered scientific evidence is valid and reliable. *United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000). Second, the court asks whether the evidence will help the trier of fact, which is generally a question of relevance, or "fit": assuming the evidence is reliable, will it "assist the trier of fact to understand or determine a fact in issue." *Maryland Cas. Co.*, 137 F.3d at 784 (quoting *Daubert*, 509 U.S. at 592). The court's role in limiting expert testimony is important: "due to the

4

difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." *Cooper*, 259 F.3d at 199.

**B. Burns's Lump-Sum Damages Opinion**

Defendants first argue that Burns' opinion is unreliable and unhelpful because he does not conduct analysis for each trade secret, but offers a lump-sum damages opinion "that transforms the alleged value of all log and lumber loading at a public port into damages." They also argue that Burns has not shown the causal link between his damages calculation and their alleged misconduct since he assumes that all of Keystone's lost business value is attributable to defendants, and in his reasonable royalty and disgorgement opinions, he allocates all of the forecasted avoided costs and net profits to the trade secrets. This is unreasonable, defendants assert, because it "effectively concludes that [Keystone] as a hypothetical licensor would be entitled to 100 percent of any profits from a licensee's operation of a logistics business using the alleged trade secrets at the VIP." (Mem. Supp. Mot. Exclude Op. & Test. Burns 14–17, Dkt. No. 80.)

Defendants cite to *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1295 (M.D. Ala. 2001), to argue that Burns's opinion is unreliable because he has not disaggregated the value of the alleged trade secrets. However, the primary reason why the court in *KW Plastics* excluded the expert's opinion is because he did not consider whether the misappropriated trade secrets caused the defendant's unjust enrichment, not because he failed to assign values to each specific trade secret. *Id.* This case from the district court of Alabama does not support a finding of unreliability simply because Burns has not separated his damages value per trade secret.

Additionally, a case cited by both parties, *O2 Micro Inter. Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064 (N.D. Cal. 2005), is instructive here. Defendants highlight that the

court in *O2* excluded plaintiff's expert's testimony when the expert bundled all the trade secrets together. However, as plaintiff notes, the procedural posture of the case there must be considered. It was only after the jury trial and plaintiff's failure to prove that all the trade secrets were misappropriated that the court excluded the expert's damages calculation. Because the expert's damages calculation was based on the assumption that all of the trade secrets were misappropriated, but the jury only found that five of the eleven trade secrets were misappropriated and only one trade secret resulted in the defendant's unjust enrichment, the court found that the expert's damages calculation was, at that point, "useless to the jury" and left them "without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages." *Id.* at 1076–77. While Keystone may consider the court's warning in *O2* about bundling all of its trade secrets together for its damages calculation, *id.* at 1076, the case does not stand for the proposition that Burns's damages opinion should be excluded at this point—before Keystone has had the opportunity to prove its alleged claims. His opinion is relevant if the jury finds that NWH did misappropriate all alleged trade secrets.

Moreover, any potential prejudice from Burns's expert opinion and testimony—with his lump-sum damages calculation—can be cured by a limiting instruction, if appropriate, to the jury to only consider his opinion if it finds that all information he relied on to make his calculation constitutes a trade secret. *See, e.g.*, *United States v. Lane*, 883 F.2d 1484, 1498 (10th Cir. 1989) ("As a general rule, we presume that juries follow [limiting] instructions."); *United States v. Sahakian*, No. CR 02-938 (A) VAP, 2007 WL 9676546, at *4 (C.D. Cal. Nov. 27, 2007) ("If the Court finds that the jury is possibly being misled or confused by the expert witness testimony, the Court may instruct the jury . . . [with a] limiting instructions to cure the prejudice.").

6

## C. Burns's Reasonable Royalty and Unjust Enrichment Opinions

Burns's opinion regarding defendants' unjust enrichment includes: 1) disgorgement of NWH's unjustly earned profits and avoided cost on sales, and 2) an assessment of reasonable royalty against NWH for misappropriation of trade secrets. (Burns Report 33, Dkt. No. 99-2.) Defendants argue that Burns's reasonable royalty calculation is unreliable and speculative because he replaced an accepted methodology with his own fee-per-container method, his use of "speculative volume projections" does not resemble "NWH's actual and anticipated experience at the VIP," and he included lumber volumes in his analysis, although NWH has not shipped lumber at VIP. (Mem. Supp. Mot. Exclude Op. & Test. Burns 17–20.) Defendants also argue that Burns's disgorgement opinion should be excluded because NWH has received no economic benefit at the VIP from 2017–2018, it does not consider that Keystone was being terminated regardless of NWH's alleged conduct, it includes lumber, and it assumes that Keystone's license would have been continually renewed. They highlight that Burns did not limit his analysis of lost profits to the time that the alleged trade secrets would have remained confidential before NWH would have properly obtained them.

As to reasonable royalty damages, Keystone argues that the disagreement between its expert and defendants' expert is not a proper basis for excluding Burns's opinion and that Burns extensively defended his methodology in his initial and rebuttal reports. Keystone also contends that the method for calculating royalty damages is not as rigid as defendants suggest. (Mem. Opp. Mot. Exclude Op. & Test. Burns 11–13, Dkt. No. 99.) As to disgorgement and avoided costs, Keystone asserts that whether its lease would have been terminated anyway is a question of fact for the jury, that lumber should be included in the calculation (NWH has performed test loads with lumber and it was included in its forecasts), and there is no specific requirement that

7

the damages calculation be tied to the time the trade secrets would have remained secret. As to the reliance on inaccurate financial projections, Keystone notes that Burns addresses this in his rebuttal report. (*Id.* at 9–11.)

Notably, in trade secrets cases, "[c]omputing damages . . . is not cut and dry." *Am. Sales Corp. v. Adventure Travel, Inc.*, 862 F. Supp. 1476, 1479 (E.D. Va. 1994). The Fifth Circuit has recognized that trade secret misappropriation cases require a flexible and imaginative approach to damages, and are controlled by their own peculiar facts and circumstances. *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974).

The Defend Trade Secrets Act is silent on what qualifies as a "reasonable royalty" for a defendant's use of a misappropriated trade secret, and the Fourth Circuit has not addressed the issue. *See* 18 U.S.C. § 1836(b)(3)(B)(ii). Consequently, courts within the Fourth Circuit have turned to *University Computing*, which "is a leading case on calculating a reasonable royalty." *Check 'n Go of Va., Inc. v. Laserre*, No. CIV.A.6:04 CV 00050, 2005 WL 1926609, at *5 (W.D. Va. Aug. 9, 2005). The court in *University Computing* explained that "a reasonable royalty is simply that amount which the trier of facts estimates a person desiring to use a [trade secret] would be willing to pay for its use and a [trade secret] owner desiring to license the [trade secret] would be willing to accept." 504 F.2d at 537 n.31. Calculations under this approach imagine a "hypothetical negotiation" between the plaintiff and defendant "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before [misappropriation] began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). The ultimate goal of this theoretical framework is to measure "the actual value of what has been appropriated." *Univ. Computing*, 504 F.2d at 537 (internal quotations omitted).

The court has considered all of defendants' objections to Burns's methodology for his reasonable royalty calculations and concludes that none of them require the exclusion of his opinions. First, while his methodology is challenged by Kleinrichert, defendants' expert, the court cannot say that Burns's methodology is not sufficiently reliable or accepted in the field. As the court views it, Burns and Kleinrichert simply have different approaches to calculating damages, and there are, perhaps, pros and cons to each approach. Those pros and cons are the types of issues that can be addressed through cross-examination and the presentation of contrary evidence. *See United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006) ("As with all other admissible evidence, expert testimony is subject to testing by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" (quoting *Daubert*, 509 U.S. at 596)). Moreover, unlike the hypothetical negotiation methodology for which defendants argue, Burns's fees-per-container methodology uses actual numbers, and in doing so, attempts to measure the "actual value of what has been appropriated"—the very purpose of the hypothetical negotiation approach. *Univ. Computing*, 504 F.2d at 537.

With regard to his unjust enrichment damages calculation as a whole, Burns has explained why he applied the methodology that he used, and those explanations are not based merely on his say-so. (Burns Report 10–11, 33–35, 46–54.) Recognizing that, "in the trade secret misappropriation context, the proper measure of unjust enrichment damages is the total gains of a defendant's wrongdoing," Burns appears to have applied a proper and reliable methodology in his report. *Steves & Sons, Inc.*, No. 3:16-cv-545, 2018 U.S. Dist. LEXIS 80306, at *19 (E.D. Va. May 10, 2018). Indeed, he testified his belief that "the entire business of [Keystone] was misappropriated for all intents and purposes," including the "lease, the assembled workforce, the customer relationships, the ingate and outgate data, the processes, et

9

cetera," and he based his opinions on this belief. (Burns Dep. 230–40, Dkt. No. 99-16.) While defendants are free to pursue vigorous cross-examination on this topic, the court cannot say, based on the supposed discrepancies, that the analysis is so flawed as to be unreliable and inadmissible.

Further, Burns's methodology, in addition to the other issues that defendants have with his opinion, including his allegedly speculative volume projections, the inclusion of lumber, NWH's economic benefit at the VIP, and Burns's assumptions about Keystone's license, all do not pertain to the admissibility of Burns's expert opinion. Indeed, this court, in exercising its discretion, "need not determine that the proffered expert testimony is irrefutable or certainly correct"; instead, it must only find that the testimony is "reliable and relevant and thus admissible under *Daubert*." *Moreland*, 437 F.3d at 431 (quoting *Daubert*, 509 U.S. at 596). Again, everything defendants have raised about Burns's assumptions and opinions is subject to "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.* (quoting *Daubert*, 509 U.S. at 596). Having reviewed the parties' briefing on this issue, the court concludes that whether Burns's opinion is correct is an issue the jury may consider in deciding its *weight*, but it does not affect its admissibility because the court does not find that it is unreliable.

## D. Burns's Lost Value Calculation

Defendants also argue that Burns's lost value calculation for Keystone's "Before Harm Value" improperly uses a "going concern value" rather than a liquidation value because Keystone was "on its deathbed" or "nominally in existence." They point to evidence to show that Keystone was in financial trouble and argue that the "Before Harm Value" was materially overstated. (Mem. Supp. Mot. Exclude Op. & Test. Burns 25–28.)

10

In contrast, Keystone maintains that Keystone was a going concern prior to defendants' allegedly harmful conduct. Like defendants, Keystone provides evidentiary support for its position. Keystone also contends that the determination of whether it was a going concern is a question of fact for the jury. (Mem. Opp. Mot. Exclude Opinions & Test. Burns 9.)

Again, this is a difference in opinion between experts and does not call into question the reliability or admissibility of Burns's opinion. This is not a situation where Burns's expert opinion is too speculative or based on assumptions unsupported by the record. *Cf. Concordia Pharm., Inc. v. Method Pharm., LLC*, No. 3:14-cv-00016, 2016 WL 1464639, at *6 (W.D. Va. Apr. 13, 2016) (excluding an expert's opinion on damages because it was based on unsupported assumptions). The jury will have to determine whether Keystone was properly considered a going concern. Thus, the differing opinions between the experts are proper for jury consideration. *See Mosser v. Fruehauf Corp.*, 940 F.2d 77, 83 (4th Cir. 1991) (endorsing the notion that the jury should weigh the evidence and credibility of competing experts).

**E. Burns's Rebuttal Report**

Defendants claim that Burns' rebuttal report is an improper attempt to correct and bolster his initial report. They note that Burns changed the date of harm for his lost value calculation and argue that this was because he realized the date in his initial report (December 31, 2016) was unreliable. Defendants also argue that Burns attempts to offer new opinions "in the guise of recalculations" for his disgorgement opinions and that the rebuttal report is the first time he opines that transloading of lumber "is the highest and best use of VIP" for NWH. Last, defendants point out that while Burns says he recalculated his reasonable royalty opinion based on the mathematical errors identified by their expert, he did not say specifically what he corrected. (Mot. Strike Burns Rebuttal Report, Dkt. No. 66.)

11

Keystone argues that the new date of harm was included by Burns after reviewing additional discovery to rebut the defendants' expert's opinion. It also states that several documents and depositions that he relied upon were not made available to Burns until after the deadline for his initial report. As to the disgorgement and reasonably royalty opinions, plaintiff argues that the figures in Burns's report are "literal recalculations" of defendants' expert's calculations. (Mem. Opp. Mot. Strike 3–4, Dkt. No. 98.)

Rebuttal evidence is defined as "evidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party." *United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001) (quoting *Black's Law Dictionary* 1267 (6th ed. 1990)). An expert report "must directly address an opposing expert's findings or opinions to qualify as rebuttal." *See Boles v. United States*, No. 1:13-cv-489, 2015 WL 1508857, at *4 (M.D.N.C. Apr. 1, 2015). A rebuttal report does not "permit an expert to correct mistakes based on information that was available to the expert well in advance of the issuance of his report." *Snider-Jefferson v. Amigo Mobility Int'l, Inc.*, No. 2:15-CV-406, 2016 WL 4424954, at *4 (E.D. Va. Aug. 17, 2016). "Expert reports that simply address the same general subject matter as a previously-submitted report, but do not directly contradict or rebut the actual contents of that prior report, do not qualify as proper rebuttal or reply reports." *Boles*, 2015 WL 1508857, at *2.

The court has reviewed Burns's rebuttal report and finds that it primarily addresses defendants' expert's report. This is precisely the intended purpose of rebuttal evidence. The only new conclusion that it set forth is the date of harm for his lost value calculation because, according to Burns, defendants' expert revealed a mathematical error he had made. Moreover, Burns identifies the new information upon which he relies in his rebuttal report, including evidence of emails and phone calls. (Burns Rebuttal Report 3–6, Dkt. No. 99-3; Appendix A to

Burns Rebuttal Report, Dkt. No. 99-4.) Thus, his report properly addresses the opposing expert's findings and makes changes based on information that was not available to him at the time of his initial report. For these reasons, his rebuttal report will not be struck.

### III. CONCLUSION

For the foregoing reasons, the court will deny the motion to exclude Burns as an expert and deny the motion to strike Burns's rebuttal report. An appropriate order will be entered.

Entered: April 22, 2019.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge